Case is Largan Precision v. Genius Electronic Optical Co. 2015-1695. Mr. Dunner, when you are ready. Good morning and may it please the court. Genius argues that Largan has presented zero evidence on its active inducement charge. That contention is not only inconsistent with direct evidence that's in the case, but it's inconsistent with a ton of circumstantial evidence in the case. And a good place to start is Genius' argument that there's a dispute that we haven't established that the Largan patents cover the claims. The District Court found to the contrary on page 815. He said that there's no... your case, which is the failure to establish that any Genius lenses ended up in the United States. So if you could just focus all of your argument right there, that would be useful. There are... all we need to do is show that it's more probable than not. And I think we have... Out of curiosity, why did you not just break open an Apple phone? I mean, I have one back in the chambers. It would have been so easy to do. Why didn't they break open a single phone, a single iPad, anything just to be able to show that some devices made their way into the U.S. with Genius lenses? Your Honor, I think the evidence is circumstantially overwhelming that they made their way into the United States and that Genius believed that. First of all, they were put on repeated notice from Largan that the Largan patents covered the Genius products. One of those documents, 8810, expressly said... But again, I have no objection to your arguments about infringement in terms of the lenses covering... being covered by the Largan patent. My only question to you is where is the evidence that these things ended up in the U.S.? Because there's no direct infringement unless they're in the U.S. So where is that evidence? Circumstantial evidence is fine, but where is the circumstantial evidence of that? The evidence is that Genius believed that they went in the United States and they were told that their products were in the United States. On 8810, they were told expressly that their lenses were incorporated in Apple products sold in the United States. They were told by who? Pardon? Told by who? Told by Largan. Told by Largan in that document. Wait, so the patentee tells them that their products with their lenses are ending up in the U.S. and you think the patentee's claim that they're ending up in the U.S. is evidence that they did end up in the U.S.? If that were true, wouldn't it eliminate the need for actual evidence in every case? It's a totality of circumstances argument. Let me just add to that. The argument is that not only were they told that their products were covered by U.S. patents, but the documents that we have relied on showed that they said there was... they had a patent problem. They changed one design because of a Largan patent. They said it was a big issue for their company. They engaged in a multi-year, two-year project to evaluate whether or not they infringed U.S. patents. No rational company would engage in a two-year project. Just to follow up on Judge Moore's question, the points you're making are points that are of its lenses were ending up in the United States, but I don't know if you can point to what they may have subjectively believed or not believed as evidence that to meet your burden that the lenses actually arrived in the United States. I guess that's the piece that I hear Judge Moore wondering about and I'm also wondering about is what evidence can you point to that we know what's going on inside the black box of the supply chain in China to have some comfort that, yes, genius lenses have arrived in the United States inside of Apple products? Your Honor, there are two batches of evidence. One is the document I mentioned, ADA10, where they were told their product was in the United States. Secondly, the test is more probable than not and I say a reasonable jury could assume that because genius engaged in this multiple-year investigation because they said in documents there was a big risk for them because they changed the design of a product because of a US patent. All I'm saying is when you put all these things together, no rational and one of the letters was sent to the head of the IP department, the very first letter in genius. That letter didn't reference any of the patents that issue in this lawsuit. It wasn't until the end of the two-year period that Largen made genius aware of these patents. You're absolutely right. Genius conducted a two-year attempt to design around other patents that Largen made it aware of. I don't see any evidence in this record that Largen made it aware of these patents until the end of that two-year process so I'm not sure circumstantial evidence of attempts to design around different patents not in this lawsuit is the circumstantial evidence that you need. Your Honor, all I'm saying is if you put all of this evidence in a bucket and you look what does this evidence tell you? It tells you that genius wouldn't have gone through any of this if they didn't believe their products were sold in the United States. It tells you not only as to the patents in suit but as to the patents not in suit. It tells you there's a document that says their product is in the United States and we couple that. But is that evidence or is that supposition? You draw inference from all reasonable inferences are to be drawn in favor of the non-moving party which is Largen. In other words, your strongest argument is that this shouldn't have been decided on summary judgment? No, there can be a dispute. The judge can put it to trial. All we need to show is that a reasonable jury could have ruled for Largen on these facts. What I didn't mention which has to be added to the points I did mention is that, and there are certain things I cannot say in court because they have been masked out, but it's clear that hundreds of millions of lenses of Largen and genius were sold around the world. It's clear that hundreds of millions were sold in the United States. It's clear that Apple did not differentiate between Largen and genius. We don't know what the suppliers did. I don't believe any of this is confidential. Just wave your hands at me if I start going there. I'm going to avoid all numbers. I think that's the key confidential stuff. But we know there are at least two Asian suppliers in the supply chain. There are people who get the lenses from genius and put them in camera modules. There are people that take the camera modules, a separate company takes the camera modules and puts them in phones and iPads. Then those phones and iPads are imported by the second company sent to Apple for Apple's distribution in the U.S. We know that Apple didn't care or place any limitations on whether it was Largen or genius lenses that were put in whichever phones were going anywhere. That is in the record, but what we don't know is how did each of these two suppliers handle it. Maybe supplier number one said let's put all the Largen lenses going to the U.S. Maybe supplier number two said let's only ship the iPhones with the Largen lenses to the U.S. There would have been good reason for them to do that in fact because those suppliers were the ones that imported the product directly and therefore could have ended up being accused of direct infringement. We don't know. It's a black box and you all could have taken discovery on all of that at any point in time and didn't and added it to this record. You're right. There is a probability in the abstract it could have happened. We know abstract didn't, Apple didn't dictate how it happened, but we don't know what two separate companies in the chain decided to do. Your Honor, our position is there was no reason for the suppliers to discriminate against genius lens and ship only Largen. Sure there was. The supplier is the one who imported them. They would have been guilty of importation of an infringing device or inducing infringement by importing the device. I don't understand what reason would they have had to ship only Largen products in the United States. If they had been aware of the Largen patent, which we don't know, then they would have been aware that if they shipped the iPad with the genius lens, they'd have been infringing the Largen patent because they were the ones that imported. Your Honor, that certainly is a possibility. All I'm saying is when you put all of these items in the bucket, it is a reasonable jury on this evidence could have found for Largen on this issue. It could have found that it's more probable than not that given the fact that they went through an investigation, given the fact that they found that three Largen patents were infringed by three genius products, at the end of the investigation or in the middle of it, they found that. None of them were in the U.S. Pardon? None of them were in the U.S. Your Honor, you don't reach a conclusion that a patent is infringed, a U.S. patent is infringed, unless you have reason to believe that your products are in the United States to infringe that patent. You don't have any reason to reach that conclusion. You don't have any reason to change the design of your product unless you believe that your products are in the United States. All I'm saying is that is substantial evidence on which a jury could rely to rule in favor of Largen. That is more probable than not. You're raising, the district court said, well, maybe their investigation had to do with those samples that were sent in the United States. And on page five of the red brief, they argue those were de minimis samples, .50s and a two, two millionth of a percent of the total products. All I'm saying is a reasonable jury could The district court also exempted from the summary judgment a particular product line, a couple of particular product lines, right? One product line that Genus was almost exclusively providing to Show sourced. Yeah. Right. I'm trying to be very careful with all the confidential information. And another product line And me too. And another product line where it was clear that based on the raw number of lenses produced by Largen and the raw number of lenses produced by Genus and the number sold in the U.S., some of the Genus lenses in that product line had to have ended up in the U.S., right? That is true. The district court, so the district court exempted from summary judgment, all of those. That is true, your honor. And all I'm saying is that the test is a very low test. And I think we meet that low test. The test more probably than not drawing inferences in Largen's favor. The district court drew all the inferences in Genus's favor. I think from my standpoint, it is a common sense analysis. A common sense analysis tells you that when the products were interchangeable, when either one could have been provided, when Apple was putting no pressure from the record on any of its suppliers to put one or the other into the United States, coupled with this long two-year analysis that shows you that Genus believed its products were in the United States or it wouldn't have done all the things that it did, I say that is substantial evidence to show that the products were not only in the United States, but that Genus believed that they were in the United States. Let's say the rebuttal time, Mr. Donner. I will, your honor. And before we begin, Mr. Sipior, this is a useful time to commend the parties for submitting supplemental briefs and appendices, lessening the amount of material claimed to be confidential. The court appreciates that. Thank you, your honor. May it please the court, addressing some of the points that the court has raised. It is precisely the case, as Judge Moore has noted and Judge Shannon has followed up on, there is no evidence on the record of an Apple product having a Genus lens being in the United States. They never cracked one open. But there's a good basis to suppose, isn't there? Most of the Apple products are sold in the United States and the products were designed with the Apple people in the United States. Isn't there enough there to survive summary judgment? No, because the evidence is that the amount of lenses that were sold could have been supplied by Largan. We've carved out, as we've talked about, the couple of categories that are in dispute. And with respect to what's left, all of the lenses that came in the United States in cameras, in phones, could have been supplied by Largan. But aren't they entitled to a trial on the question of whether they were? Well, in a circumstance where they could have obtained the evidence, their argument is based on randomness. They're saying there must have been a random distribution. There is no evidence of a random distribution here. In fact, the only citation of the record that we've seen that we cited was at 6281 where there's some indication by our own employee that Largan lenses, in some circumstances, perform better. We also know that Largan hasn't been sued for patent infringement. So the real issue is, since Apple doesn't know, who would know? The module integrators or the system integrators? They would have a reason to discriminate or know where things go. Both issues would be covered. But a single subpoena was served on them. There was no attempt to take any discovery. There was no effort whatsoever to create a record on this. In that circumstance, to give them the benefit of the doubt seems totally improper. There has to be some basis. Ninth Circuit law, which governs the standard here with respect to summary judgment, says mere allegation and speculation do not create a factual issue dispute. So with respect to that specific issue where they could have created a record and there is none, they're not entitled to get inferences based on a randomness supposition. What if, hypothetically, they did try to get that information from the system integrators and camera module integrators and they were unable to get that information? Then would our fact pattern be exactly the same and we would still be granting summary judgment under that scenario? No. There's another piece, though, because that's not the only place they could have gone. There are people who are experts in this field. This is the Apple supply chain. There are people who know how it works and they know how things are distributed. They didn't talk to any of them either. They could have had expert testimony on this. They could have spoken to someone who knows that supply chain and how those decisions were made. Why do certain lenses go in certain cameras and at certain places? We're talking about worldwide distribution. There are some lenses, weren't there, where the district court didn't grant summary judgment? Correct, Your Honor. One was to a whole product line where there was a sole supplier situation. Although we dispute that. That's the issue. It was disputed. Whatever, but it's on summary judgment. Yes, ma'am. It's not granted. Then there was a second group of products where it was a numbers game. The number of lenses Largan produced wouldn't have actually been sufficient to supply the entire number of U.S. sales. The district court denied summary judgment there, too, because it has to be the case. If it's two supplier market and Largan only made 10 units and 12 were sold in the U.S., it has to be the case that the other two had genus lenses, right? I'm making up numbers for the obvious reasons. Yes, I understand. Isn't there a second product group where that's the case, a particular project? There are two product numbers. Their product number and ours, but it's actually one specific product we're talking about. We had a dispute about whether or not there could have been inventory, there could have been other ways that things could have been supplied. It was a limited time period for a particular product. Right. Okay. I understand, but the district court denied summary judgment on that. Correct. A limited time period for a particular product. Given that there's a question of fact and it looks like genus lenses would have had to have been used or supplied to the products that ultimately ended up in the U.S. during that particular time period for the particular product, why isn't that additional evidence that really strongly indicates that suppliers were not simply and only using Largan lenses for U.S. sales? Well, there's an inference upon inference. First of all, we dispute the fact that there was a sole source during that time those products would have come in. There's an issue of inventory and whether or not, while we may have been supplying during a particular time period, that's only supplying to the module integrator who goes to the system integrator. What the system integrator may have on shelves in terms of Largan, we don't know. We disputed that issue and the judge carves it out. But you don't have a strong case on that. Just assume for now that I think the district court is 100 percent right in not granting you summary judgment on that case and that the strength of your case in my mind on that is not very strong. Now what? Like, what happens? How does that fact implicate what the suppliers were doing with lenses in general? If we assume, if I may, for purpose of this record, if we assume what you say is true, that in that circumstance the module integrator passed the system integrator these lenses and there was no alternative supply, and therefore to send the product to the United States, the system integrator in China would have had to use a genius lens, and that supply went to the United States. If we assume that, then they would like to infer, well, that means there's no discrimination. That means that they're willing to use. But in that circumstance, if there's a sole source, there isn't a choice to be made, right? There is no other option. That's part of the problem. You're speculating upon speculating. Who knows what their thought process was? But if in that circumstance is the case, where they had no other choice and they imported, that doesn't prove that there was no discrimination, it just proves in that case they didn't have a choice. The numbers here, which I will not articulate, but are so overwhelming that it just seems really unlikely that some genius lenses didn't end up in the U.S. But is it just simply, you know, it's their fault because they should have had to show that? What if they had come in and shown that one phone? What if they came in and said, we just bought this phone at Best Buy, we cracked it open, and look, there's our lens in it right there. Would that have been enough to get completely filled this hole in the proof? I don't think a single one would have been enough. Because when we're talking about... Why not? Because then this is summary judgment, and what it would have shown is at least some supplier let through genius lenses. It would have to depend on the circumstance. Just the example you gave could have been the circumstance of that sole source example. We need to know the circumstances, I would say. But... Doesn't that all go to damages? I mean, it just goes to damages. How many? How many goes to damages? The hole in the infringement question is, did any get over? That is true. And on this record, there is none. If you pose a hypothetical that some made it to the United States, then you have a case. But the fact is, they don't. And if I may, I don't have a lot of time, but I may switch you over to a couple of the other issues. I think, honestly, that issue arguably is our weakest point. They focus on it. Right. Percentage-wise, didn't some of them get through? The answer is, there's no record to support they did. And they had a chance, and they didn't prove it. That's why, isn't probabilities enough? I mean, this is summary judgment, and it's inferences. And why isn't a probability enough? I mean, suppose, I'm making these numbers up, to be clear. But suppose they were the 75% supplier of lenses, and Apple says, we don't care which lenses you use in the products that come to the U.S. There's no agreement in the supply, nothing in the supplier agreement that tells them from Apple they must use a particular lens. Suppose they're the 75% supplier, and yes, I guess it's possible that every lens that ended up in the U.S. was, in fact, a Largen lens. But why, under those circumstances, where Apple says, we don't care, these two lenses are interchangeable, and we don't care which one you use? Well, what you're going back to, I would say, in that circumstance, is you're going to random. You're saying, therefore, there must be some random distribution. There must be some, because if there was a principled reason why, for example, the system integrator or the module integrator didn't want to put a Genius lens in a camera that went into an Apple product, that would completely exclude the possibility of importation of a Genius product in the United States. That's possible in this record. We don't know. The only way that you get to the point you're discussing is by random. You're saying, well, it's a random situation. Anything could have happened. But the point is... When Apple tells them it doesn't matter which lenses to use, why should we assume, in the absence of any evidence, that they nonetheless chose to segregate the lenses? Oh, that's not the record. The record isn't that Apple told anybody that they don't care. What Apple said is, we don't track it. There's no evidence what the module or system integrator said. No, Apple also said the supply agreements don't require either particular kind of lens, right? Isn't that what Apple said? Didn't Apple say... We can dig through our evidence. I'm pretty sure Apple said that they don't place any requirements on the suppliers with regard to which lens. I believe that's right. They don't have any geographic requirement with respect to lenses. There's no discussion about whether Apple told them, oh, gee, you can do anything you want or that we have a preference. Okay, but Apple is the ultimate customer. If the customer says to the supplier, oh, you know what? I don't care which lens you use. Either one of these is fine. Here are two suppliers that I have. You may use either of their lenses to fill this order. If that's the case, then why isn't that enough? I mean, this is summary judgment. We're just wondering if they proved enough to get to the next stage. Well, they haven't because the source of that decision making is at the system integrator or module integrator level and there's no evidence. Under the case law, when there's no evidence, you can't just randomly make inferences on the record. You have to make reasonable inferences. And under the circumstances where all of the lenses could have come from one source, where there's evidence on the record, for example, as we pointed to at 6280, that there's evidence that Largan lenses perform better, where we have evidence that Largan didn't have, quote unquote, an infringement problem, the system integrator could have decided not to use them. There's evidence that Genius met with Apple in the United States to design the lenses. Isn't that evidence? Yes. Isn't that circumstantial evidence from which one can infer that some of the products got into the United States? Absolutely not. Apple is in the United States. They're in Cupertino, California. That's where you have to go if you want to talk to Apple. But Apple sells its products all over the world, and it's very easily the case that these products could have been dedicated just to China, or to Taiwan, or to Korea. Under the Pulse v. Halo case, or Halo v. Pulse case, this court has said that kind of contact doesn't establish enough to establish infringement. So you're saying Apple is in the United States, of course, but lots of their products are manufactured either in Taiwan or in China? China, primarily we're talking about here. But they're distributed all over the world. Just because you speak to someone in the United States doesn't mean you're selling in the United States. There's an assumption here, and it goes to this, if I could get to this active encouragement issue. The easy, easy way out of this case, and it's very simple, the judge found on one basis he found lack of knowledge, and we haven't talked about that very much here. But there was no knowledge, and there was no evidence to support it. But the easy out is active encouragement. There's a requirement under the law. Microsoft, Larkin must show that Genius took an affirmative act to encourage infringement with knowledge that the induced acts constitute patent infringement. They're not arguing willful blindness. They're arguing willful blindness, but there's no evidence on that either. If you look at the case law on that, the Supreme Court case, the Global Tech case, there has to be something that you did affirmatively to do that. We have a Taiwanese company that didn't have lawyers, that did a technical analysis in engineers and looked to see where the elements were present. They got a letter on April 2nd, 2013, and they were sued on June 4th, 2013. So there's a two-month period. During that time period, they looked at some things, but there was no lawyer involved. There was no analysis done from a lawyer's perspective. They know about the patent. They learned about it on that date. You were right about what you said. I know, but they learned about the patent. They manufactured the lenses for Apple, which it knew to be located in Cupertino, California. They knew Apple products were sold in the United States. Wait, wait. Are you going to tell me your company doesn't know Apple iPad 2s are sold in the United States? There's no evidence. Seriously? That would be the most... I feel like I could take judicial notice of that. Well, I guess you could, but that's not in the record. I mean, that's not necessary for the finding here. The point is, what active steps did Genius take to encourage infringement by Apple in the United States, importation in the United States? What basis did Genius have to believe even that importation in the United States was necessary? Mr. Dunner says that they must have believed that there was importation in the United States. The theory of liability in this case of lawyering, the primary theory of direct infringement, was by virtue of Genius' activities in Taiwan and China, that it was a direct infringer. It has nothing to do with whether or not Apple products went in the United States. That's their primary theory of liability. Do both of these companies continue to produce lenses for Apple products currently? To my knowledge, yes. So if there is simply a hole in the proof vis-a-vis what happens in the supply chain, couldn't Larkin just bring... and satisfy that hole? I think they have... To the extent they try to satisfy the hole, they could try, but they have other holes because there's no active inducement by Larkin of Genius of anything that Larkin does. Genius does not care where lenses go. That's established and controversial in the record. They took a couple dozen depositions trying to find someone who said... That's why it's called willful blindness. Well... Yeah, or let's just assume that they know, that they know that some of their products are getting into the United States, and now they are selling those lenses to the supply chain. That doesn't count as active encouragement of Apple directly infringing the patented lens in the United States? No, I don't know how it would. The fact that Apple might sell in the United States, where Apple sells all over the world. You think about an inducement case where you have instructions or manuals or advertising or promotion or encouragement some way. There's nothing of that kind in this case. This client, this company, Genius, is indifferent to where the lenses get sold. And even if they knew, even if they knew that products were in the United States, of theirs, that were in Apple products, there's no evidence whatsoever and there's no basis for reasonable inference that they did anything to encourage that, that they wanted Apple to bring things to the United States. There has to be a specific intent to encourage an active infringement. Thank you, counsel. Let's hear Mr. Dunna's rebuttal. Thank you, Your Honor. I'd just like to get a few points. One is that the question is, Judge Moore asked some questions, and I know they were just questions, but nevertheless, she focused on, isn't it more likely than not that given the outcome came into the United States? And the answer is the test, it's a 50% plus a feather is the test. That's what the courts talk about. And I think it is inconceivable that given all these facts that some of the products didn't come into the United States. Now, they charged us, how come we didn't investigate? And when we said they should have investigated, they said, well, they would have hit a blank wall. The fact is, all they had to do to get out of the infringement issue that was created by Largan's letters was to show that their products were not so important in the United States. They never did any of that. They talk about- That's an interesting question. Who has the burden of looking inside the black box called the supply chain here? Is it the patent owner, or is it the defendant? Your Honor, the patent owner has the burden of proving active inducement by a preponderance of evidence. So we have the burden. But all I'm saying is, when you've got this bucket with all these facts, and it would have been the easiest thing for them to have established that their products were not sold in the United States, that's something they easily could have found, and they didn't. They didn't do that. All I'm saying is, that's a piece of evidence that goes to what is more likely than not. What is 50% plus a feather? What you're saying is, they didn't carry a burden that they didn't have. No. What I'm saying is that it's a piece of evidence. We have the ultimate burden. But it's a piece of evidence that goes into whether it's more likely than not that they were selling products into the United States. They mentioned briefly willful blindness and active encouragement. I would direct the court to the MEMC case on active encouragement. On willful blindness, I would direct the court to Infohold and Suprema. The facts of those cases were very similar to the facts of this case. And I see, Judge Lurie, you're looking at me as though my time has expired. Thank you, Mr. Donner. We'll take a look at it with a very careful lens. Thank you, Mr. Donner. Goodbye. All rise. The Honorable Court is adjourned until tomorrow morning at 10.